MEMORANDUM OF DECISION
On May 7, 1999, the Department of Children and Families, hereafter "DCF", filed petitions for the termination of the parental rights of Alicia D. and Juan I., Sr.[2] to their biological children, Sheena D. and Juan I. The two children were removed from the home on March 5, 1999 and an order of custody granted on March 9, 1999.
After the commencement of the termination petitions, paternity testing established that Juan I., Sr. was not the biological father of Sheena D. Alicia D. named Gregorio P., who was located. Thereafter, during the course of the trial, paternity testing revealed that he was also not the biological father of Sheena. Subsequently, the court ordered publication of notice to the unknown father, John Doe. CT Page 6827
The neglect petitions alleged that the children were denied proper care and attention and that they were permitted to live in conditions, circumstances or associations that were injurious to their health. Further, it was alleged that Juan was uncared-for as his home could not provide the specialized care he required. Connecticut General Statutes § 46b-129. The termination petitions allege that both Alicia D. and Juan I., Sr. have failed to rehabilitate so that they could parent these children and that the children were adjudicated neglected in prior proceedings. Further, it is alleged that the children have been denied, by reason of an act of parental commission or omission, including but not limited to sexual molestation or exploitation, severe physical abuse or a pattern of abuse by each of the parents, the care guidance and control necessary to their physical, educational, moral or emotional well being. Connecticut General Statutes § 17a-112 (c)(3)(B) and (C). As to the unknown father of Sheena, the petition alleges that he has abandoned this child and has no ongoing parent-child relationship with her. Connecticut General Statutes § 17a-112 (c)(3)(A) and D.
The trial on the termination petition against the parents was held over four days on April 5, 6 and 7 and June 7, 2000. After the third day of trial, April 7, 2000, the court continued the trial for receipt of evidence regarding the paternity testing for Gregorio P., and in the alternative, to proceed against John Doe. On April 5, 2000, Gregorio P. provisionally consented to the termination of his parental rights, should he be found to be the biological parent of the child. Subsequently, the court received evidence of the paternity testing results and found he was not the biological father of this child. The court ordered notice to the unknown father by publication. The trial ended on June 7, 2000, upon receipt of results of Gregorio P.'s paternity testing, publication notice and testimony regarding the petitioner's efforts to locate this unknown father. For the reasons stated below, the court adjudicates both children neglected and grants the petitions for termination of the parental rights of Alicia D. to her two children, Juan I., Sr., to his biological son, Juan, and John Doe as to Sheena I.
From the evidence presented, the court finds the following facts:
 A. FACTS 1. Alicia D., the mother.
Alicia D. is now thirty-four years old. She was herself in the foster care system and is the eighth of ten children born to her parents. Her removal from her family of origin when she was a child was brought about by the problems her parents had with alcohol abuse. Alicia reports a suicide attempt when she was thirteen years old, after which she received CT Page 6828 psychiatric treatment for three or four years. She also reported that she was the victim of multiple rapes, at the age of nine, fourteen and twenty.
Alicia married when she was nineteen in 1984 and then had three children by her first husband. A fourth child of the marriage was born after the parties separated. During the time of her marriage, she began to use illegal drugs and in 1989 was arrested. The children were removed from her care and then placed with their maternal grandfather. Subsequently, when problems continued, the three children were placed with their paternal aunt in Virginia. Wayne D., her husband, instituted divorce proceedings and secured an order of custody for the three children. Alicia did not attend the divorce trial due to the expected birth of her fourth child, also named Alicia D., who remained in her care. In 1989 or 1990, Alicia met Juan I., Sr., Juan's father. During this time and continuing until 1996, Alicia has admitted to using cocaine daily and supporting her habit through prostitution. She admits that her relationship with Juan I., Sr. began when he was one of her "customers," but later he became a boyfriend. She also admits that she used cocaine during her last four pregnancies, which include Alicia and her older sister and the two children who are the subject of this matter, Sheena and Juan I.
(a) Events since 1995.
DCF alleged that since 1995, there have been eleven substantiated referrals of abuse or neglect to DCF concerning Alicia and her family. The first is that Juan was born on July 1, 1995 and tested positive for cocaine. This fact the court finds was proven, based both on the uncontested record and the admissions of Alicia D. On June 15, 1996, there was a referral from Alicia's school, setting forth educational neglect and raising questions about sexual and physical abuse of Alicia. Alicia, then age five and in kindergarten, had heavy bleeding from her vaginal area. Investigation revealed that there was a metal screw lodged in her vaginal wall. Sexual abuse was not confirmed at that time. On August 14, 1996, the police reported that Alicia D., the mother, was a crack-cocaine user and left the children hungry and dirty in the father's care. They also alleged the children were sleeping on urine soaked mattresses and appeared malnourished.
The worst incident occurred in November 1996 when there was a fire in the home in which Alicia, Juan I., Sr. and the children lived. Juan was one of a set of twins. His twin, Diane, was killed in this fire and Juan himself was badly burned over sixty percent of his body. In the ensuing years, Juan has received extensive medical care and had several surgical procedures at the Shiner's Burn Hospital in Massachusetts for his CT Page 6829 life-threatening medical condition. At the time of the fire, Juan, his twin and Sheena were in a room together, unsupervised and, as was suspected by the fire department, playing with matches. At the time of the fire, Sheena was three years old. She has subsequently disclosed in counseling on several occasions that she lit the fire because she was mad at her parents. It clearly was a traumatic experience for this child, still exacting its psychological toll on her.
After the fire, neglect petitions were filed and the children were adjudicated neglected the next spring, on April 3, 1997. Protective supervision was ordered at that time, as the children remained in the care of their mother and Juan I., Sr. The supervision period was extended and subsequently ended on January 3, 1998. During the period of supervision, as well as immediately thereafter, there continued to be community reports of neglect and abuse. School personnel reported that Alicia told them her mother had hit her with a belt. On June 11, 1997, Sheena was noted by the Wheeler Daycare program to have bruises on her face. The Department of Social Services reported that Alicia D., the mother, was under the influence of drugs while in their office on August 3, 1998.
(b) The present proceedings.
The present proceeding began when the DCF social worker then assigned to the case went to the home on October 19, 1998 and found the children very dirty and smelling of urine. She discovered that the mattresses in their rooms were urine-soaked with stains covering them. Juan, who was receiving physical therapy due to his severe burns, was extremely dirty and slept on a mattress that sagged. The school reported that Juan often came to school with poor hygiene. Cleanliness for Juan was more important than for most children because his healing wounds from the fire and the danger of infection.
The worker found numerous fire code and health code violations during her visit. Specifically, there was an electric heater with a frayed cord, an extension cord used with a freezer and no functional smoke alarm. The family was cooking on an outdoor propane grill in the kitchen. There was a large gaping hole on the stairway leading upstairs, large enough for the children to fall through. When the fire inspector came a few days later, the situation in the home was the same, but now the two front windows to the home were shattered and large pieces of glass were missing. The panes were left in the room where Juan was running and playing and not moved until the social worker pointed out the danger and requested they be moved.
Counsel for the father argued that Juan I., Sr. was cooperative and CT Page 6830 remedied all these problems while the fire inspector was present. However, for a family who had lost one child to a fire in the household, the neglect of basic safety measures and lack of concern over fire precautions within the home, including the use of an outdoor grill, shows a family unable to focus on the basic needs of their children. At the time, the family had no electricity, as they had been unable to pay the bill. Their public assistance benefits had been cut off as neither Alicia nor Juan I., Sr. had complied with their obligation to seek work outside of the home. There was no reason they could not have worked, except that Alicia was continuing her drug-addicted lifestyle, leaving the home for days at a time, while Juan I., Sr., who is more than twenty-five years older than Alicia, remained in the home and cared for the children. On November 5, 1998, the pending neglect petitions were filed.
The full extent of Alicia's drug use began to become obvious following the filing of the neglect petitions in 1998. She admitted to the DCF social worker that she had begun using heroin in 1997 and that by February 1999, she was injecting nine bags daily. Later she would admit to eleven bags daily. Her daily drug use continued unabated until she was arrested for possession of drug paraphernalia on March 5, 1999 while in court for hearings for the pending neglect petitions. At the time, she admitted she had used earlier that morning prior to coming to court. On that date, based on an oral motion, an order of temporary custody was granted for her daughter, Alicia D. (Dennis, J.). A ninety-six hour hold was invoked on Sheena and Juan, Jr. and an order of temporary custody signed for them on March 9, 1999 (Rogers, J.) None of the children have been in the care of their biological parents since that time.
The chaotic life Alicia and Juan led with their children was also borne out by Alicia's own testimony at trial. She stated that she was away from the house for days at a time. She testified that Juan would not allow her to return to the house and that he frequently hit her. Nonetheless, she boasted of the fact that even though she was on the streets, she was able to keep her children from DCF, unlike the other women who were out on the streets with her. She maintained that Juan took good care of the children, without seeming to be aware of the significant problems within the household. She testified she knew Juan had other women come to the house for sex and this made her mad.
Because of the arrest in court and other warrants for her arrest for previous charges, Alicia D. was incarcerated in October, 1999. She remained incarcerated at the beginning of trial in April, but was released in May. Her plan was to live with her mother.
Until the time of her incarceration, Alicia D. continued to use drugs, the court finds. For example, she was unresponsive and often asleep CT Page 6831 during an evaluation of the family conducted by a court appointed psychologist on April 26, 1999. The report of that evaluation noted "mother was literally absent throughout much of the evaluation, since she was quite stuporous and unable to communicate very much with the children."[3] Dr. Ramos-Grenier concluded that Alicia D. has "some emotional difficulties and a significant substance abuse problem." She stated that "she was under the influence of some type of substance and was unable to remain alert for even a few minutes." Dr. Ramos-Grenier concluded that Alicia D. was not the psychological parent of either of the children. She did not recommend even visitation with the children for this mother until she was able to abstain from using substances.
Dr. Richard Sadler performed a psychiatric evaluation of Alicia D. in September, 1999. His assessment of her was bleak. He could not foresee any circumstances under which the children could be returned to her care. During his testimony, he noted that while medication for her depression would improve her functioning, but that "even if she was as well as could be expected, I would not recommend that her children be returned to her. I would not consider her able to raise her children." In his written report, he stated:
 "Ms. D. gave no suggestion whatsoever that she had made any gains in insight, understanding, ability or awareness regarding her parenting deficits. Ms. D. is so entirely self-absorbed and so self-referential as to show not even ambivalence or conflict regarding her own behaviors and their effect upon her children. At no time did she express guilt, regret or remorse regarding her own behaviors in relation to her children. At no time did Ms. D. suggest that she had, in any way at any time, directly or indirectly contributed to the multiple severe abuses and the multiple developmental impairments that are demonstrated by her children."[4]
He was equally pessimistic about her ability to make any changes in the future. He found that Alicia "gives no suggestion that she is taking steps to make changes that would need to be made by her in order for her to be able to minimally adequately care for her children." He noted no symptoms of a psychiatric disorder, although there were clinical symptoms of a depressive and anxiety disorder.
2. The disclosures.
The full extent to the abuse and neglect within the home did not become apparent until the removal of the children from the home. The first child CT Page 6832 to make accusations was Alicia, then age nine. She confided, shortly after she was removed from the home, that Juan I., Sr. had sexually abused her, that her parents hit her and the other children with a belt, and that her mother placed her arms as well as Sheena's over a flame on the stove as a form of discipline. She also reported that Mr. I. would take baths with her and then with Sheena when she refused. She further reported that he would wash her private parts with extra soap despite her protests and that he would "lick" her face and the inside of her mouth when she was in bed at night.
It was not long after Alicia's reports that Sheena, too, began to report and corroborate many of the statements her older half-sister made. On March 5, 1999, Sheena told her foster mother that "her Dad (Juan I., Sr.) put things in her behind." "She did not," the social worker testified, "call it a penis, but she pointed to the penis area when asked about this." Sheena reported that he did this to her sister too. She stated that he had taken a bath with her and her sister. She also confided that she was hit with a belt, especially after church and that her mother was aware of this and did not stop it. She reported that her mother burned her on the arms, using the stove to do so. Like her older half-sister, she stated this was a form of punishment.
The DCF social worker testified that some of the disclosures happened during the transportation times when her brother Juan was there. "One day, out of the blue," the social worker testified Sheena said that "she had lit the fire in her house, killed her little sister and hurt her bother. She stated that she was mad at "Daddy Juan and her mother at what he was doing to her. She stated she "burned the bed where bad things were happening. She was playing with matches and she lit the fire." As if this were not enough, Sheena reported that she was tied up regularly by both parents, although "Daddy Juan" normally cared for them. She said she was tied up and left tied up and that she and Juan were tied to the bed to keep them in the room. Alicia, their mother, acknowledged this was so and that she or Juan, Sr. would tie the door shut.
On April 22, 1999, Sheena and Juan were interviewed by Tina Schmitt at the Child Guidance Center in Bridgeport on an emergency basis, as they had begun acting out in their foster home. Juan was reported by his foster mother to be frequently masturbating, touching himself constantly and have difficulty with toilet training. Sheena had also been wetting her bed, had difficulty sleeping, had tantrums and became hyperactive when angry. Ms. Schmidt testified that as a result of her consultation, she was "concerned that at least Sheena and her sister had been sexually abused to some degree and Juan physically abused to some degree."' She wrote in her report that:
CT Page 6833 "Sheena is a friendly child who quickly attached to the (therapist) . . . She appears needy and attention seeking. She quickly disclosed alleged sexual abuse by mother and father. She talked about setting a fire."[5]
Her purpose was to assess the children's need for treatment, not to determine that sexual abuse had occurred. She recommended that both children receive regular therapy, which has been taking place.
The Yale Child Sexual Abuse Clinic conducted a sexual abuse evaluation of both children. The children were first seen on June 2, 1999 and interviewed several times thereafter. They each received a medical examination, which did not reveal any physical indications of sexual abuse. Ms. Bombaci, the sexual abuse social worker at the Clinic, conducted the interviews and concluded in her report that Sheena had been the victim of child sexual abuse. "Sheena has clearly and consistently reported to this interviewer and other providers that she was `touched' by her father, Juan I., Sr. Her reports include penile penetration, fondling and oral-genital contact."[6] Ms. Bombaci testified that Sheena was open with her and that she secured most of the information from her second session with the child. She noted that in the first session Sheena was anxious and embarrassed, not an unusual reaction in a child. Juan was very active in his interview session, but was unable to engage in the interviewing process. He was hyperactive and could not focus on even simple tasks. Ms. Bombaci noted that his speech was also delayed. She concluded that he may have been sexually abused in his home, but could not be more specific than that. She was aware that both Sheena and Alicia had reported that his father touched Juan as well. She noted that the "sexualized behavior he had been exhibiting in the foster home added credibility to the sexual abuse allegations."
Sheena's therapist from the Child Guidance Clinic also testified. She noted that Sheena was withdrawn, highly guarded and difficult to engage in therapy. It was "difficult for her to trust adults." After a number of sessions, she communicated better and was more comfortable. As a result of her sessions with Sheena, she came to believe that Sheena "was sexually abused, physically abused, and neglected as well." She stated that she engaged Sheena in play therapy and that during the course of the sessions, Sheena would disclose things to her. At other times, she would mention things in passing. She told the therapist "bad grownups should not do things to little children." My Daddy did things to me that I did not like." From time to time she had Sheena write stories, one of which she provided to the DCF social worker as well as two drawings the child made during the course of their sessions. The short story that Sheena told, which the therapist transcribed verbatim was:
CT Page 6834 "Once upon a time the bear was walking in the woods. The bear saw a little Barbi doll. The bear ate the girls toti. The little girl felt icky. So the girl smacked the bear in his face. They fighted together. The bear pushed the girl over in the woods. The girl ran away and got some blueberries. Her run away by herself and go cook them. Her got to pay the blueberries.
 There was a cat and a dog coming together and they saw the Barbi doll and the bear fighting. And then a little kid saw them fighting and then an elephant saw them fighting and a baby. The bear sticked his tongue out at the little girl. The police helped the little girl. They put the bear in jail. The bear sticked his tongue out at the girl. Her happy when the police put the bad bear in jail. The police girl says stop sticking your tongue out at the girl. The bear had to stop because he was in big trouble. The girl was not in trouble.
 The dog and the cat and the small little bear lived happily ever after with the girl. "[7]
Sheena also completed two drawings. One depicts a little girl stick figure and she told the therapist "this my daddy eating the girls toto." On the same page is a second picture of a little girl with the words "STOP" written in large print next to it. The last one is of Sheena's hand prints made while finger-painting. At the time she completed this drawing, Sheena said to the therapist "This is the Dad's hands. He is touching the girls toto." When the therapist was questioned at trial about the date the story was told to her, she stated that both the story and the drawings were made in the time between October and December, 1999. They were not done on the same day, but close in time to each other. The therapist provided them to the DCF social worker for the case record.
3. Juan I., Sr., the father of Juan I.
Juan I., Sr. is now fifty-nine years old. He states he was married. He reported that he was employed for about twenty-five years as a machinist. He became unemployed when the company relocated. Since January, 2000, Juan I., Sr. has been incarcerated on charges stemming from the sexual abuse of Sheena; namely sexual assault and risk of injury to a minor. As earlier noted, he met Alicia, the mother, while she was actively engaged in prostitution. There is no question that Juan cared for the children in CT Page 6835 the home while Alicia was unavailable to them. After Juan's severe burns, he brought him to the hospital, and cared for him as best he was able when the child was in his "burn suit" to permit his skin to heal. He cleaned him twice a day as required and put ointment on his skin. He brought him to the hospital for the various surgical procedures that young Juan required. His counsel has eloquently argued that Juan I., Sr. held the household together, while the children's mother was not available due to her severe drug abuse. The court acknowledges that he did so, but at a high emotional price for the children in question.
Juan I., Sr. also participated in the psychological and psychiatric evaluations conducted by Dr. Ramos-Grenier and Dr. Richard Sadler, respectively. Dr. Ramos-Grenier conducted the first evaluation on April 24, 1999. At one point during the evaluation when the children were using the bathroom, both Alicia and Juan I., Sr. were waiting in the hallway. Sheena and Juan returned to the evaluation room and Juan, Sr. told Sheena that he had a new dresser and bed for her at his home. The evaluator reported that during this conversation Sheena said to Juan I., Sr. "Daddy, you're not going to hit me no more?" His response was "You know I don't hit you." Dr. Ramos-Grenier at that time recommended visitation between the children and Juan I., Sr., but not with Alicia D. As to Juan, Sr., Dr. Ramos-Grenier found "Mr. I does not show any serious emotional problems, but his tendency to blame others for his difficulties can negatively affect his ability to develop appropriate relationships and to discharge child care responsibilities. "[8]
Dr. Sadler evaluated Juan I., Sr. in September, 1999. He testified that he found Juan I., Sr.'s responses "disingenuous and largely unreliable" and did not find him to be an accurate historian of the events in his life. He noted in his report that the present relationship Juan I. had with the two children
 is a relationship without parental attention to the needs of the children. Mr. I spends his time during the evaluation describing his own characteristics and attention to parenting while also describing children whose needs are not being met. . . . I was unable to detect, from Mr. I.'s descriptions, a sense of there being actual children (emphasis added) for whom Mr. I felt himself to be caring. Mr. I.'s description of his children never became personalized or provided individual descriptions of differentiated relationships."
Dr. Sadler believed that termination of parental rights was in the children's best interests and did not believe that either of the children CT Page 6836 now or at any time in the future should be permitted to live with Mr. I. He reported that "no degree of counseling, visitation, medication treatment or psychotherapy would be expected to make changes in either Ms. D. or Mr. I that would allow either to become an adequate parent."[9]
 4. John Doe, the unknown father of Sheena I.
As indicated, notice of these proceedings was provided to John Doe by publication. Alicia D. was also questioned by DCF about Sheena's paternity. She had no further names to provide to DCF. What is known is that at the time of Sheena's conception, Alicia was actively engaged in prostitution to support her drug habit. No one has come forward as a result of the publication of notice regarding Sheena. No one claiming to be her father was involved in Sheena's life, other than Juan I., Sr., whom the court has determined is not her biological parent.
5. Sheena and Juan I., the children.
(a) Sheena I.
Sheena is now seven years old and Juan will be five on July 1, 2000. Their present foster mother testified to the progress both children have made since they came into her home in August, 1999. When Sheena first arrived, "she would do a lot of rocking and not make eye contact. She did not have any self-esteem and did not like herself at all." She reported that Sheena wet the bed several times a week and would hit her head against the bed at night as well as falling out of the bed. There were aggressive behaviors and she was very destructive of toys. She also would not listen to her foster mother. She was not doing well at school and she was not able to express herself "When I asked her why she did something, when she could not tell me. she would shut down." Sheena did not take care of her own physical cleanliness and there were a number of sexualized behaviors in the home. Also, she noted that when the children first came, "they would dress in front of each other, there was looking and touching and they were doing more looking and touching than getting dressed."
Initially, Sheena was in a self-contained special education class at school and the "lowest student in the class." Since her placement, she has learned to read and write, can count past ten, knows her colors and the days of the week. The foster mother testified that she hopes Sheena can be placed in a regular second grade. She has now advanced to first grade. She reports that Sheena has made great progress in her sense of self-esteem and that she has built up her self-image little by little. It took Sheena a long time to trust her foster mother. Sheena also disclosed both sexual and physical abuse to her foster mother, who helped her learn CT Page 6837 the proper words for the various body parts she was describing. Sheena's statements to her foster mother were consistent with what she had reported to others. Her foster mother noted that Sheena never mentioned her mother and only talked about Juan I., Sr. in the context of the disclosures.
Sheena's therapist also testified to the significant progress Sheena has made in the last year. She noted that Sheena is much more verbal than she was in the beginning, that her eye contact is good and that she is expressive in her play and words. In general, the focus of her therapy has been on ego building and self-esteem, "affirming Sheena's right to express herself and encouraging her to use words to express herself rather than behaviors." She stated that Sheena has made "extraordinary progress" and that her therapy would be ending soon.
(b) Juan I.
Juan is now four years old. He will be five on July 1, 2000. His foster mother reported that he had many of the same behaviors as Sheena when he first arrived in her home. He rocked back in forth in bed a lot. He did not exhibit any sense of structure or self-control and would not listen. He would regularly use swear words, telling her he hates her and cannot stand her. He also would not make any eye contact. He, too, exhibited sexualized behaviors, like "getting up and putting his head on my breast and touching me there." He would also ask her to wash him.
He was very active and would run away and be very destructive. For some time, his foster mother stated he has been receiving assistance from a therapeutic pre-school program called the ABCD program. He is a good student and she hopes they will be able to place him in the local magnet school soon. She noted that "he is highly intelligent and feeds off the activity of other children." She testified that he is now more adjusted to her home. Sheena and Juan are both comfortable with the three other older children in the home; a fifteen-year-old daughter, a seventeen-year-old son and a seventeen-year-old foster daughter. She noted that the "older ones cater to them and are protective of them."
Juan's therapist at the Child Guidance Center also testified. She noted that she saw Juan twenty-seven times starting in September, 1999. She noted that he was "extremely impulsive and there was difficulty in the management of his behaviors." He did not allow himself to be soothed by others. He was "hurt, angry and scared and ambivalent to his care givers." She noted that the child appears aware of his burns and knows that "he is different from others." She noted that he had "concerns about his bodily integrity and his sense of himself." She stated he would hide under the table and only one part of his body would poke out. She then would then CT Page 6838 try to find him. Another game that happened frequently was that he played out visits to the hospital when he was hurt.
His therapist observed that he did not speak of his family of origin. Further, this was one of the notable things about working with him. "Most children who are four will bring their parents to the therapy or use the therapist as a transference object and work out issues through the safe parent figure." The implication she drew from Juan's failure to do this was that he had never had a nurturing attachment to a caretaker.
She testified to the great strides Juan has made. "Now," she noted "he allows himself to be soothed by his caretakers. He will allow himself to relax in someone's lap. He is somewhat less impulsive and agitated. His hyper vigilance is somewhat abated and he is learning to control and modulate his responses." He has attended the ABCD program and his therapist also works as a consultant there. She has seen Juan in the classroom setting as well. She stated that "he is a bright child and, I think that because much of the trauma occurred before he was verbal, he is just minimally articulating these issues verbally." She believes that he requires permanency. She noted that his strengths are that "he is an engaging, sweet little boy with a natural curiosity about life and that he can learn academically."
6. The various permanency plans to care for tire children.
The DCF social worker testified that there are at present two DCF plans for the children. The first is for them to remain with their present foster mother, who is not sure that she wishes to adopt them, although she is considering it. The second is to place them in Virginia with their mother's previous husband, Wayne D. Wayne has volunteered to take the two children and they continue to express that they miss their older sister, Alicia D., who now resides permanently with her biological father and her three older sisters in Virginia.
Alicia D. also presented a plan for the children, as she understands that she cannot now care for them fully herself. Both her mother and her sister. Migdalia L., testified in court about their willingness to accept the children and care for them. The children's maternal grandmother testified that she has not had much contact with the children recently, but that she saw them when they were in the care of Alicia and Juan I., Sr. In her testimony, she made it clear she did not care for Juan I. and his impact on her daughter. She testified that she saw Juan I., Sr. hit her daughter on three or four occasions and that the children were present when this happened. She testified that Juan kept her away from the children. DCF has not considered the grandmother's offer due to her own past DCF history with her now grown children. CT Page 6839
The children's maternal aunt also testified. She stated she was willing to be a resource for the children, if her sister's rights to them were terminated. She noted that she had not spent much time with the children in the past, but that they know her as their aunt. At present, she resides in an apartment that would be too small for the children. But she is in the process of applying for a larger one. She testified that she believes that "the family should always be together." She stated that she offered herself as a resource to DCF, but that they stated her quarters were too small and did not consider her further. Neither Alicia D.'s sister or mother filed a motion for transfer of guardianship of the children to them.
 B. NEGLECT ADJUDICATION
In hearing petitions for neglect and termination, the court:
 "first adjudicates whether there is neglect. Only when a finding of neglect is made does the court move on to the dispositional phase of the neglect petition. Disposition in a neglect petition may take one of a number of forms, including return to parent, return to parents with a protective order, foster care placement or the initiation of proceedings to terminate parental rights." In re Juvenile Appeal (84-AB), 192 Conn. 254, 261, 446 A.2d 808, (1984). (Internal citations omitted.)
The standard of proof in the neglect phase is by a fair preponderance of the evidence and in the termination phase, if reached, by clear and convincing evidence, a more stringent requirement. Connecticut Practice Book (Rev. 1998) § 33.12, Connecticut General Statutes § 17a-112
(b).
In accordance with the statutory requirements and the case law, the court finds by a fair preponderance of the evidence that Alicia D. has neglected both Sheena and Juan I., pursuant to Connecticut General Statutes § 46b-120 (8)(B) and (C) as of November 5, 1998. Because of her drug use and unavailability, both children were denied proper care and attention, physically, educationally or morally. Also both were being permitted to live under conditions, circumstances or associations injurious to their well being. Further, the home could not provide the care that Juan I. required. Juan I., Sr. also neglected his son, Juan I. The court adjudicates both Sheena and Juan I. neglected children. The court further adjudicates Juan I. an uncared-for child. No neglect petition was filed against Sheena's unknown father, John Doe. CT Page 6840
 C. ADJUDICATORY TERMINATION FINDINGS 1. Reasonable Reunification Efforts.
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts . . ." Connecticut General Statutes § 17a-112 (c)(1). DCF does allege that both Alicia D. and Juan I. Sr. are unable or unwilling to benefit from such services. While the court is well aware of the extensive services offered to Alicia D. while the first neglect petitions were pending and in the time since then, none were offered to her after the pendency of the termination petitions. The court finds, based on the clear and convincing evidence, that she was unable to benefit from such efforts on May 7, 1999, the date of the filing of the termination petitions. She also has been both unable and unwilling to benefit from them in the past. The court-appointed psychiatrist was unequivocal that no amount of services would ever be able to restore Alicia D. to a useful parental role. The court is persuaded by his testimony and clear opinion.
Juan I., Sr. also is unable to benefit from reasonable reunification services. The psychiatrist, Dr. Sadler, noted that Juan did not view the children as distinct children with their own individual sets of problems and needs, that he blamed others for his problems and he, too, had no potential for rehabilitation in the future. The court also finds the evidence clear and convincing as to Juan I., Sr.'s sexual and physical abuse of Sheena.
As to John Doe, the unknown father of Sheena, he never came forward to acknowledge his daughter. The court finds that DCF made reasonable efforts to locate him. The court also finds that he was both unable and unwilling to benefit from reunification services.
2. Alicia D.'s Failure to Rehabilitate and Acts of Omission andCommission.
The court has adjudicated both Sheena and Juan I. neglected children. The court further finds, by clear and convincing evidence, that as of the date of the filing of the termination petition on May 7, 1999, Alicia had not achieved such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, she could assume a responsible position in their lives. Connecticut General Statutes § 17a-112 (c)(3)(B). "Personal CT Page 6841 rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." Inre Migdalia M., 6 Conn. App. 194, 203, 504 A.2d 532 (1986), see also Inre Juvenile Appeal, 1 Conn. App. 463, 477, 473 A.2d 795 (1984). The court concludes Alicia D.'s lack of rehabilitation continued even after the filing of the termination petition and that there is no prospect that she will be rehabilitated within the foreseeable future.
The statutory framework requires the court to analyze the parent's rehabilitation "as it relates to the needs of the particular child" and consider if such rehabilitation is foreseeable "within a reasonable time."In re Luis C., 210 Conn. 157, 1167, 554 A.2d 722 (1989), In re Hector L.,53 Conn. App. 359, 366-367, ___ A.2d ___ (1999). Because of this requirement that the court predict what may happen within a "reasonable time" after the filing of the termination petition, the court must consider not only Alicia's conduct prior to the filing of those petitions, but also her conduct since that time. In this case, this was a period of one year. The court concludes from the evidence, that until her incarceration, Alicia was still actively engaged in substance abuse. It may be that she has been able to maintain her sobriety since that time, due to the constraints the prison environment imposes. However, the court concludes that she cannot be rehabilitated as a parent of these children within the reasonably foreseeable future, consistent with their needs for permanency.
The second ground alleged against Alicia is that the children have been denied, by reason of an act of parental commission or omission, including but not limited to sexual molestation or exploitation, severe physical abuse or a pattern of abuse by each of the parents, the care guidance and control necessary to their physical, educational, moral or emotional well being. The court further finds that this ground for termination has been proven by the clear and convincing evidence. First, the court credits the evidence of her burning Sheena's arms, a form of severe physical abuse. Further, Alicia committed parental omissions in terms of her lengthy absences from the home, her knowledge of the neglect and abuse inflicted on the children by Juan I., Sr., and her failure to protect them.
The case law further requires for this ground to be proven that there be serious injury to the children. In re Kelly S., 29 Conn. App. 600,614, 616 A.2d 1161 (1992), In re Sean H., 24 Conn. App. 135, 144-145,586 A.2d 1171, cert. denied, 218 Conn. 904, 588 A.2d 1078 (1991). The court so finds from the clear and convincing evidence.
3. Juan I., Sr.'s Failure to Rehabilitate and Acts of Omission andCommission.
CT Page 6842
There is clear and convincing evidence of Juan I., Sr.'s failure to rehabilitate. The evaluators question his ability to parent. Dr. Sadler believes he cannot ever be rehabilitated. The court concludes that a significant amount of work would be required on his part, none of which has yet commenced. His physical discipline of Juan, as well as of Sheena, and his inability to nurture either child, speak of his significant parenting lacks.
As previously noted, the court concludes from the clear and convincing evidence that Juan I., Sr. sexually abused Sheena while she was in his care. These acts have caused this child grievous emotional injury. He also hit her and used other forms of inappropriate discipline. Sheena, however, is not his biological child, although his treatment of her reflects upon his ability to parent any child. The court finds that Juan I., Sr. has no understanding of the impact of his conduct and gross parenting failures on his child. Based on the foregoing, the court finds that Juan I., Sr. has not and cannot be rehabilitated as a parent to Juan I. The clear and convincing evidence also supports the conclusion that there is no prospect that he can be rehabilitated at some reasonably foreseeable time in the future.
The evidence as it relates to acts of omission and commission for Juan is less clear. The treatment providers believe that it is likely that this child was sexually abused. but are less certain than in Sheena's case, as Juan has not disclosed this. Indeed, much trauma was inflicted on this child before he was fully verbal, he court, however, cannot find that acts of omission and commission have been proven by clear and convincing evidence. This is a standard that, in the court's opinion, requires some specific evidence greater than the therapists' speculations and the court's reasonable suspicions, based on Juan Sr.'s clear mistreatment of Sheena. The court must also find that such acts or failure to act inflicted serious injury on the child. As the evidence does not support a clear finding of any act or lack thereof regarding Juan, the next required finding of serious injury also cannot be made. The court therefore dismisses this termination ground as not proven.
4. The Allegations against John Doe, the putative father of Sheena I.
The court also finds that John Doe abandoned Sheena. "Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." In re Juvenile Appeal(Docket No. 9489), 183 Conn. 11, 14, 438 A.2d 801 (1981). John Doe was never involved in the life of this child. His identity and whereabouts are unknown. CT Page 6843
The second ground for termination of John Doe's parental rights is his failure to have an ongoing parent-child relationship with his child. To succeed on this ground, DCF must show the absence of "the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child and [that] to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child." Conn. Gen. Statutes § 17a-112
(c)(3)(D); In re Savanna M., 55 Conn. App. 807, 815, 740 A.2d 484 (1999). This ground encompasses a situation in which "regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitely lost that relationship. so that despite its former existence it has now been completely displaced." In re Juvenile Appeal (Anonymous), 181 Conn. 638,645, 436 A.2d 290 (1980) (internal citation omitted). John Doe has never come forward to claim this child and has never had such a relationship. The court so finds from the clear and convincing evidence.
 D. REQUIRED FINDINGS
The court makes the following factual findings required by Connecticut General Statutes § 17a-112 (e):
(1) Appropriate and timely services were provided by DCF to the family. These include services to benefit the children, referrals for Alicia to deal with issues of parenting and substance abuse. DCF also provided visitation and case management services.
2) As previously noted, the court finds by clear and convincing evidence that all of the parents were both unwilling and unable to benefit from reunification services, None were possible to be made for John Doe.
3) The terms of any applicable orders entered into and agreed to by any individual or agency and the extent of fulfillment of those obligations. The court finds that reasonable court expectations were set for Alicia and Juan in the neglect proceedings and that neither were minimally able to fulfill them. None were set for John Doe.
4) The feelings and emotional ties of the children with respect to the parent, any guardian of the person and any person who has exercised physical care, custody and control of the children for at least one year and with whom the children have developed significant emotional ties. Sheena and Juan have not yet been in their present foster home for one year. However, they view their foster mother as their psychological parent and do not speak of either their mother or Juan I., Sr. Sheena CT Page 6844 does not know her putative biological father, John Doe.
5) Finding regarding the ages of the children: Sheena is seven and Juan will be five on July 1, 2000. He is now four years old.
6) Finding regarding efforts of the parents to adjust their circumstances, conduct or conditions to make it in the best interests of the child to return him to their home in the foreseeable future and (A) the extent to which the parents have maintained contact with the child as part of an effort to reunite the child with them, provided that the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communications with the guardian or other custodian of the child. As detailed above, the court finds that none of the parents has made any changes in their lives to accommodate the care and nurturing of these children.
7) Finding regarding the extent to which a parent has been prevented from maintaining a reasonable relationship with the children by the unreasonable act or conduct of the other parent of the children, or the unreasonable act of any other person or by the economic circumstances of the parents. No such conduct is noted. DCF took steps for a number of years to assist this family.
 E. DISPOSITION
The court concludes, from the clear and convincing evidence, that here is no biological parent who will be able to care for these children. The court concludes, from the clear and convincing testimony, that both children require permanency and stability in their lives. The court further finds that permanent placement or adoption by a family that understands and can accommodate their needs is the avenue most likely to accomplish permanency for them. The court further approves the present DCF permanency plan for these children. The court does not find the claims of the maternal relatives persuasive and approves DCF's determination that neither the maternal grandmother nor aunt is a suitable resource for the care of these children. The court finds, by clear and convincing evidence, that termination of their parents' rights to them is in the best interests of Sheena and Juan I.
Based on the foregoing, the court therefore orders that a termination of the parental rights of Alicia D. to her two children, Sheena and Juan. The court also orders the termination of the parental rights of Juan I. to his biological son, Juan I., and those of John Doe to Sheena I. The Commissioner of the Department of Children and Families is hereby appointed their statutory parent. The court further suggests that if the CT Page 6845 placement of the children with their half-siblings in Virginia cannot be accomplished, DCF should provide the foster family first consideration for adopting these children, if the family is prepared to take this step. The court further orders that a permanency plan for these terminated children be submitted within sixty days. A review plan for them shall be filed in accordance with state and federal law.
Barbara M. Quinn, Presiding Judge Child Protection Session